## Case No. 4,824.

FISHER et al. v. The SYBIL.

[Brunner, Col. Cas. 274; [1] 5 Hughes, 61; 6 Hall. Law J. 509.]

Circuit Court, D. South Carolina. June, 1816. [2]

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]
[2] [Affirmed in 4 Wheat. (17 U. S.) 98.]

JOHNSON, Circuit Justice. If ever there was a case in which the claimants on a libel for salvage were thrown upon the protection of a court, this is one. There is not a witness to anything that occurred on the ocean, who is not interested in increasing the compensation. Even Dangerfield, the master, to extricate himself from damages and censure, finds his interests coincide with those of the libellant, in making out a justification for abandoning the vessel. However the witnesses may differ in representing the merits of each other, they all, with the exception of one (I mean the Indian seaman, Francis,) concur in making this out a case of great distress, and complete abandonment. The practice of this court permits the individual in such a case, to exhibit his own merits on his own oath, and it is but too evident that most of the salvors have attached much importance to the idea that this is a case of derelict, and that the salvage in such a case must necessarily consist of a large proportion of the goods saved. It is only in the contest for the distribution of this proportion that they disagree, and each one showing too strong a disposition to present himself as the hero of the adventure. Their advocates have ably and ingeniously argued that cases of derelict are cases in which the salvors are peculiarly entitled to a liberal reward; that the courts have manifested the most striking liberality in such cases, generally giving one half, sometimes as far as three fifths, never less than one third. The property libelled being of considerable amount, nearly one hundred thousand dollars in value, it becomes very material to the salvors to maintain this doctrine. But whoever looks into the history of the law of salvage, will find it to be as now acknowledged, in admiralty courts, comparatively of modern origin. Even the meaning of the term "derelict" is now materially varied from what it was originally, and the idea that the salvor is entitled to anything like a de jure compensation, has long since been exploded. In the language both of the civil and common law, "derelict," as applied to chattels, meant a thing voluntarily abandoned, so that the first finder became the lawful possessor, if he reduced it into possession. Such were the bona vacantia of the civil law; in which, in a state of nature, it is evident, whether the thing be found on sea or land, that the individual would acquire an absolute and exclusive interest; but in a state of society, whether he should take it wholly to himself or to the use of his sovereign: or what portion of it he should retain, and with whom divide the residue, must necessarily depend upon the provision of posi-

tive law. The barbarous notions in which originated the droit de bris of France, and the royal privilege of wreck in England, have long since, (among the rulers, if not among the people of those countries) given way to the progress of moral, intellectual, and commercial improvement. But there is reason to think that wreck and derelict were anciently confounded. It is perfectly natural for the inhabitant of a sea coast, whose subsistence perhaps from his earliest recollection has been drawn from the ocean, to consider whatever is thrown up by the sea as a bounty from Providence to the first finder. But the possessor of the soil would also put in his claim, and either exclude the casual trespasser, or insist that the bounty was sent to himself, and confer on the finder a portion or compensation as a gratuity. Such at this day is the law of England, with regard to the property of a pirate or enemy cast away on the coast. It is not so easy to find a satisfactory reason for the idea which too certainly has prevailed, that a shipwrecked mariner may be treated as a shipwrecked enemy. Yet in the history of navigation, we may find an apology, if not a justification for this barbarous notion.

The first nautical expeditions were certainly equipped for the purposes of war or plunder. The coasts of France and Great Britain were long infested and devastated by the cruisers of Norway and Denmark. If then every vessel that appeared threatened plunder, slavery and bloodshed, it was natural to consider every vessel that was wrecked as an enemy on whom heaven had executed vengeance. The benign spirit which religion has breathed into modern ethics would assign to an enemy in misfortune the treatment of a friend, but death, plunder and slavery may have been sanctioned by retaliation, and was certainly the law of the victor in that day. I can scarcely admit the disgraceful supposition that afterwards, as commerce extended, and the eyes of men became opened to the necessary distinction between wreck and derelict, the cruel purpose of removing a claimant or a witness could have operated to expose the lives of shipwrecked persons, but there is too much reason to infer from the laws which have been passed for their protection, that some protection was necessary. In the Laws of Oleron, art. 31, it is asserted that this often happened; and as late as the year 1798, in a case which occurred before Sir William Scott,—The Aquila [1 C. Rob. Adm. 37],—we find a magistrate alleging on oath, that the plundering of a wreck is customary on that part of the coast of England where he resided.

For the modern acceptation of the word "derelict" we may very safely take the definition of Sir Leoline Jenkins, as given us by Sir W. Scott: "Boats or other vessels (or, he may have added, any goods washed overboard at sea, or floated away from land) forsaken, or found on the seas, without any per-son in them, of these the admiralty has but the custody, and the owner may recover them in a year and a day." And such the form of the libel usually filed in such cases, declares it to be, to wit: "found floating to and fro on the high and open seas." Such goods are in the first instance pronounced "derelict" in the restricted sense of the word, to wit: abandoned from fear or necessity. But after the year and day they are considered as pure derelict, as having been absolutely and voluntarily abandoned, so that the sum or portion reserved in the registry of the court becomes a droit of the admiralty. If there is anything in the law of salvage which distinguishes the case of a salvor or "derelict," in the modern acceptation of the term, from any other salvor, I have never been able to discover it. Whether we refer to the reason of the thing, or to adjudged cases, the court appears to possess an equal latitude of discretion in all cases of salvage, and rewards either by adjudging a compensation in ratio or in number, as it thinks reasonable. One general rule, and that alone appears to run through all the cases, and that is "the compensation must be liberal, and that too not only with a view to the value and endangered state of the thing saved, the risk incurred, the skill and labor bestowed, but with a view to the general interests of commerce in promoting exertions in such cases, and to the interests of mankind in rewarding and promoting generous and magnanimous actions. The court undertakes to direct not only the justice but the generosity of the claimant. However the ancient idea that wreck and derelict was the property of the crown may have been exploded in modern times, it is very certain that something like that idea has been preserved in the adjudication, between salvors and claimants, as to the quantum which each shall retain of the thing saved. Such unlimited discretion has always been assumed, as looks very much like acting under the principle that "cujus est dare cujus est disponere." That it is not a mere case of quantum meruit is universally allowed; and why the court should prescribe a rule to the generosity of the claimant under any other idea, is difficult to discover. For the same reason it is that a compensation has been awarded to an apprentice boy instead of his master, and hence perhaps also such liberties are taken with the reasonable rules of evidence as suffer parties to make out their case upon their own affidavits, as they do in some measure in prize cases, which are certainly boons of the government. If the case of "derelict," according to the modern acceptation of the term, be considered, with a view to the reason of the thing, there will be found to be in it no ground necessarily attaching to it a superior claim to all other compensation. It is very easy to conceive a case which cannot come within the definition of derelict, which would rally all the best feeling of the heart around it in support of a

reference. Take the case of a vessel whose crew is sick or exhausted, or devouring each other for food; or take the case of a vessel without boat, on fire, or stranded, with her whole crew on board, and in danger every moment of going to pieces, where not only the vessel, but the lives of the crew are saved. In a case of pure derelict, as of a pirate, where the court knows at the time of adjudication, that the residue must be adjudged a droit, and where, of course, it is a mere bounty to the government as well as to the individual, it may very well be conceived that the court would be very liberal in awarding salvage; but when the party himself, the original owner, puts in his claim, and sets up the plea of misfortune, the case is widely different; and traces of this distinction will be found to exist in the ancient sea laws of Europe. Sir. W. Scott, in the case of The Aquila, in considering the question whether a moiety could be claimed de jure by a salvor, has said, that he could find no trace of such a right in the Consolato del Mare. As applicable to the case of derelict, according to the modern meaning, this eminent judge is unquestionably right; but the modern meaning was not probably attached to the word when those laws were compiled, for they are of great and no ascertained antiquity. But in the case of pure derelict, where the other moiety is to be given to the lord and the poor, the one moiety is by the Consolato del Mare given to the salvor (chapter 252,) and hence probably originated the English rule which appears to have existed in a remote period, that the thing saved should be divided by moieties between the salvor and the king. But by the Laws of Oleron, which are of the highest authority in this court of any of the ancient systems, all persons were required to aid and assist in saving shipwrecked goods, "and that without any embezzlement or taking any part thereof from the right owners; but, however, there may be a remuneration or consideration for salvage to such as take pains therein according to right, reason, or good conscience, and as justice shall appoint." Article 29. This article probably laid the foundation of the jurisdiction which this court is now exercising. In the 45th article of the second fragment of the Law of Rhodes it is enacted "that if a ship be surprised at sea with whirlwinds, or be shipwrecked, any person saving anything of the wreck, shall have one-fifth of what he saves." Although this article does not say what is to be done with the residue, yet it evidently relates to a case of restoration, as appears by the next or 46th article, according to which "if any one find a boat, which has broken loose from a ship and drifted to sea, and preserves it safe, he shall restore everything as he found it, and receive one fifth as a reward." Although the counsel in The Aquila argued that one half was the usual and favorite salvage in case of derelict, yet unless they meant to confine themselves to voluntary or to total abandonment, it would rather seem that (in ancient times at least) one fifth was the favorite proportion in cases like the present, or even stronger cases. For shipwrecked effects found on the high sea or "fished up out of the bottom of it," the Ordinance of Louis XIV. allowed a third to the salvor, the remainder to be restored to the owners. Section 45, art. 1, s. 27. If then we compare the ancient sea laws with modern decisions, we find that, except in case of pure derelict, they were hardly as liberal as the courts of admiralty are at the present day; and modern liberality has, I fear, been too much exerted, from a want of attention to the distinction between cases where the residue becomes a droit, and those in which it is restored to the original owner. I cannot think the argument a sound one that salvage in fact falls upon the underwriter who has been paid for the risk; for the spes recuperandi is one of the perquisites of the insurer, and which combines with others to enable him to underwrite at a less premium. Nor can I admit that the compensation to the salvor must be in a certain ratio to the thing saved, or that that ratio is not to be diminished from relation to the amount.

The question to be decided by the court is always one to which no fixed rule can be assigned. How shall the salvor be compensated? is this inquiry. And how is it possible to produce uniformity in the decisions of courts, where the judges are to act on circumstances endless in their variety and combinations, and of which any two men may take different views? Or how is it possible to detach the mind from considering the amount saved both with a view to increasing the compensation as to the claimant on the one hand, and diminishing it as to the salvor on the other? As to the question whether it shall be in proportion or in numero; if the judge, knowing the value of the thing saved, is unrestricted in fixing the compensation, it is immaterial to bind him down to the fixing of it by way of ratio, since it is so easy to bring it to numerical precision. It is true, that it has been most usual for courts to adjudge in proportion: but the reason of that is evident. Courts of justice, perhaps more than any other constituted bodies, will receive a tone in their proceedings from the mores majorum. At a time when commerce was carried on by actual merchandise, it would have been the most simple and natural mode of compensation to make an actual division of the thing saved, if susceptible of division. But at the present day, money, the medium of commerce, expresses the value and all subdivisions of property with a more convenient precision, as it is the standard by which the mind is accustomed to compare the value of things. That such a practice should have prevailed is easily accounted for from this cause. It is evident, that whenever a legislative power undertakes to affix a com-

pensation by way of salvage, it can only do so by assigning a proportion to the salvor. This is done in all the ancient systems of sea laws: and this very naturally led to the practice of assigning a proportion for salvage in the adjudications of the admiralty courts. But under the practice of modern times and the Laws of Oleron, I hold an admiralty court to be at large to decree compensation either numerically or by ratio, as it deems proper. But could I be induced to attach any importance to the idea of derelict abstractly considered I should not adjudge this to be a case of derelict even in the modern acceptation of the term. The vessel was not found derelict upon the ocean, and when she was deserted by her crew, all the witnesses prove an express abandonment of her to Mr. Fisher, or the ship's company of the Margaret. "There she is, make what you can of her." Her actual state of distress then, and the merits and compensation of the respective salvors shall govern my decision, without attaching any technical importance to. the epithet by which her state may most correctly be designated. And here while the practice of the courts permits each claimant to make the most of his merits on his own affidavit, it is impossible for the mind to detach itself from the conviction, that the testimony of any man is to be received with due caution, where he swears in his own behalf. And we are naturally led to the consideration of these facts, concerning which there can be no dispute, and these parts of the testimony of each witness which have no immediate bearing upon his own interests, as furnishing the best grounds to form an opinion upon. As to the state of the vessel, the case furnishes satisfactory evidence on all points except two leaks. The main and mizzen masts were gone, with all their rigging, and most of their spars, and in going overboard they had carried with them a part of the bulwark. The long-boat, at the time of the abandonment, though leaky, was fit for use. Afterwards it appears to have been materially injured. Water and provisions she had in abundance, and a ship's company consisting of sixteen persons, all of whom, except one or two (perhaps three) were fit for duty. Her foremast and bowsprit, with all their rigging were perfect; and the hull of the vessel new, stanch, and strong, so much so, that a ship-carpenter of great skill and experience says, "the men ought to be hanged who would have deserted her." Her nautical instruments were in sufficient preservation, her reckoning accurate, and they were at the time of meeting not above three hundred miles from our coast, not above four hundred miles from Norfolk, where the vessel was owned. and about the same distance from Philadelphia and New York, where her cargo was owned. The wind was tolerably fair for the first port, and there was little difficulty in making any port in the whole extent of the American Atlantic coast. On the state of her leaks, the evidence is various and contradictory. When they took possession of her, Fisher says, she had four feet. of water in her hold: Jones makes it only thirty or forty inches. Fisher says she made eighteen inches per hour, whereas in port she did not make above seven; but on this point there are three facts in which all concur: 1st, that four hands pumped her dry before 12 at night; 2nd, that only seventy-three bales of her cargo were damaged, and those so little as to sell for above twenty cents per pound; 3d, that the leaks did not cause the abandonment, for they were known when the ship first hailed the Margaret, at which time the captain of the Sybil expressed no idea of abandoning her. Some of the witnesses, indeed, say, that on hailing a second time, Dangerfield declared they had sprung a fresh leak. But Dangerfield in his protest says nothing of the kind; and he would not then have omitted it had it been true. I therefore conclude that the leaks did not very greatly endanger her safety.

We now come to the very material cause of the abandonment, to wit, the state of the rudder; and this indeed was the only cause, —for the protest and the evidence show that before this discovery, the captain was so far from intending to abandon her, that he only requested a supply of cordage and sails from the brig, and upon being informed that they could not spare any, he made sail away on his course. On this point the evidence is also various and contradictory. Dangerfield in his protest alleges that it hung together only by a few splinters; but this is a gross exaggeration. The rudder must have been injured in the gale, and the vessel had been nearly two days working with it in that condition, when she fell in with the Margaret. Besides, the ship-carpenters who have examined it in port agree that it required but little skill, labor, or risk to mend it. Captain Todd thinks that any gentleman then in the court room could have mended it; and several other witnesses agree that it was a very poor apology for abandoning the ship. To this we may add, what is very well known; that the loss of a rudder is by no means fatal, as a ship may be steered by her sails or by a cable, or by both in co-operation.

I now come to the most disagreeable part of this case, to examine the respective merits of the salvors—and first, of Fisher. This gentleman claims salvage on account of personal services; on account of being the owner of the Margaret, and on account of the freight of her cargo, and the sum awarded him by the district court would amount to more than twenty thousand dollars. I have pondered long upon the merits of Mr. Fisher. not uninfluenced by a reluctance at differing very widely from the opinion of the district court, or of underrating the services of any man, especially one of such high pretensions. But really no effort can bring my mind to

place this salvor on a pre-eminent footing of merit. I look in vain throughout his conduct to discover one trace of magnanimity or disinterestedness. Nothing appears in it but selfishness. He first claims a very high salvage from the owners, and then in the spirit of monopoly finds some pretext or other for excluding his fellow adventurers from sharing the golden harvest. I am far from cherishing the Utopian notion, that pure disinterestedness is to be expected from man. But salvage is not a compensation for what we do for ourselves, but what we do for others. And the man who in the prosecution of selfish views can forget what is due from man to man—I will not add from a brother sailor in a state of distress—comes with a bad grace into this court to lay claim to that liberality which is the acknowledged meed of gallantry and generous sentiments. The compensation of such an one should be limited to mere quantum meruit. I am led to apply these remarks to Fisher from the following considerations, drawn from his own testimony. 1. It is in evidence that Fisher was bred a shipwright, and his skill, dexterity, and exertions as such, form a chief ground of his claims to compensation. It is also in evidence that when the Sybil approached the Margaret the second time, Fisher came on board, and he and Dangerfield went into the cabin and examined the state of the rudder through the windows. Upon being then consulted expressly with regard to the rudder he told the captain—to use his own words—"that it was in an extremely bad state." Now the contrary of this has been expressly proved, and he himself proved it by repairing it the next day. That he was ignorant of its actual state, and of the means and facility of repairing it, cannot be supposed, whether we consider his skill as a shipwright, or his readiness to go on board immediately and take charge of her with only four men. Then what did moral duty point out to him as the conduct to be pursued on that occasion? Not surely to increase the alarm of the captain by magnifying his danger, but to point out the means by which it could be repaired, and tender his assistance in repairing it. Doing otherwise looks too much like a premeditated design to take advantage of the fears, ignorance and imbecility of the captain, to get possession of the ship. But after getting possession of her and putting her in the partial refitment with which she reached this port, if he had in his subsequent conduct shown that he was at all influenced by considerations drawn from a view to the interest of the owner, this would have operated to remove the unfavorable impression which his conduct respecting the rudder was calculated to produce. Instead of which we find, that when he was but three hundred miles from the American coast, he bore away for Jamaica, distant at least one thousand miles, at a time when those seas are much more exposed to the danger of tempestuous weather than the north coast of the United States. I do not deny that he was justifiable in doing this, for after being in possession of the vessel, they had a right to judge for themselves how far keeping company with the Margaret outweighed all other considerations; but if in their decision, as to their course, the interest of the owners gave way to personal considerations, this certainly lessens their right to demand compensation from those owners. And as the vessel was sufficient to have made the voyage to the United States alone, no one can doubt that the interest of the owners was pretermitted in the attempt to go to Jamaica. I consider Mr. Fisher for these reasons, as a salvor who had nobody's interest in view but his own, and as entitled to compensation in proportion to the incidental advantages resulting to the owners. And here may it not be asked, had the owners any cause to rejoice that the Sybil fell in with the Margaret? Would it not have been for their interest that the ship had not encountered her or any other vessel at sea? She was competent to make the voyage to the United States in all human probability, and they might then have repaired her, earned her freight, and escaped the payment of salvage. Certainly no service was rendered them by taking out the crew. And had not the crew been taken out, possessing as they did the competent means of saving their lives, in the effort to do so they would have saved the property. In one view, therefore, Mr. Fisher may be considered as the innocent cause of doing the owners material injury. But it will not do to act upon that view of the case, for the cause of humanity forbids that the captain of the Margaret should have refused on any ground to take the crew of the Sybil on board if requested. It is therefore a case of salvage, but not a case of the highest order. And as no one could have left the Margaret without Fisher's permission, I certainly consider him as the dux facti, and as such ranked above all the salvors. But he cannot lay claim to the credit of having either navigated or commanded the Sybil, or having even discharged the duties of a mate on board of her.

As to the individual merits of the salvors, it is not necessary to remark very particularly on the evidence respecting them. Jones evidently was master and navigator on board the Sybil. However Fisher may have been his superior on board the Margaret, he certainly ranked his former owner on board the Sybil. The whole crew received and acknowledged him as captain. Rice appeared to have acted as next in command, and to have enjoyed an acknowledged superiority. Beech the landsman, a character always sneered at on board ship, did his best, and deserved much credit for having volunteered among the first: not a little in my opinion from a consideration of the doubts and fears which may be reasonably expected to attend

a landsman in such an undertaking. With regard to the six colored seamen who belonged to the original crew of the Sybil, some questions of considerable nicety and difficulty arise. 1st. Whether they are to be regarded as salvors, or referred to their original contract with the ship. 2d. Whether if considered as salvors, they shall themselves receive their compensation, or it shall be adjudged to Fisher, or if not to him, to the whole ship's company of salvors. Fisher claims the whole, under an agreement which he sets up as having been entered into by these men to navigate the Sybil for twenty-five dollars per month. It appears that the day after they took possession of the Sybil they hailed the Margaret and inquired if any of the Sybil's crew who were then on board the Margaret "would volunteer" (that was the expression) on board the Sybil. These six men then came on board the Sybil; no agreement was made while yet in the Margaret, but after they are on board the Sybil they make this agreement which is set up by Fisher. I omit here, as I have omitted all along, to make any reference to the evidence of Francis, as I could wish, if possible, to avoid giving weight to any man's testimony except where it makes against himself, or his interests are unaffected by the consequences. But I confess I feel a strong moral repugnance at admitting the claim of Fisher, so far as it is founded upon the services of these men. That he who claims twenty thousand dollars compensation, and who without the aid of these men could never have earned a cent of it, should be enriched, whilst they who never, according to Rice's testimony, voluntarily quitted the ship, and who returned to it expressly as volunteers, should be put off with scarcely enough to buy them a suit of clothes, carries with it something very inconsistent with moral propriety, and I acknowledge that it is with pleasure I lay hold on any ground to get rid of the necessity of making such a decree. The case affords two sufficient grounds. 1st. It is acknowledged that they were called upon to enter as volunteers, and under that idea they came on board the Sybil. No agreement was made for wages on board the Margaret, and whether a parol agreement was made before the written agreement or not, still it was not made till they were in a situation in which every seaman feels that he is not a free agent. The confirmatory agreement made after their arrival in port, is liable to the same objection, and I here explicitly acknowledge that I am not satisfied with the fairness of the one or the other. But there is another ground of objection. Whatever may have been Fisher's situation on board the Margaret, when they entered on board the Sybil, associated with four others, their migration was complete, and they assumed new relations, although they could not have quitted the Margaret without Fisher's consent, yet neither could he, without their consent, have forced them to quit her. When therefore they entered on board the Sybil, they had their rights as well as Fisher, and he could no more lessen their compensation as salvors for his own benefit, than they could his. The agreement, therefore, with the black seamen, if it operated to deprive them of their claim as salvors, enured to the benefit of the company of salvors; but they set up no claim under it, and acknowledge that it was not explained to these seamen that they were to forfeit their claim to salvage.

But here another question arises—are these seamen, as relates to the owners, to be at liberty to depart from their original relation, and assume the new one of salvors? One thing only, can sanction such a departure, and that is, they have not been in default. Their captain, against their will, as Rice testifies, obliged them to quit the Sybil, and he could not afterwards control them to prevent their assuming this new relation. They were freed from their original contract, and at liberty to act for themselves; I shall therefore adjudge them entitled to a compensation by way of salvage. But what is to be done with regard to Perry? He is clearly proved to be an absconded slave, and his owner has lost his services for several years. To this I reply, that whatever may have been my decision, had he been at the time hired out for the benefit of his master, since he was in fact a runaway, his master must receive his compensation and not himself.

One more question remains to be disposed of. The ship had proceeded six hundred miles on her way to Jamaica, when Jones and the crew, without the consent and against the will of Fisher, altered their course in the night and made for this port. Fisher contends that this was an act of mutiny, which worked a forfeiture of the rights of all concerned in it. But it appears to me that this deviation was the first act, unquestionably correct, done by the company of the salvors. Jones was unexceptionably the master, and even if we view Fisher as the owner, which is the highest grade to which he can pretend, his station at sea is inferior to that of the master. There could not be a mutiny then where the master headed the opposition. The ship's company had a right to alter the ship's course for the good of all concerned, and more especially to make an alteration so materially beneficial to the owners of the vessel and cargo. It was the first instance in which Fisher's interest had given way to those of the owners, and this was violently opposed by him. Besides, if this forfeiture had occurred, it would not have been to the benefit of Fisher, but of the owners, and it would be absurd to adjudge that a cause of forfeiture which clearly tended to their benefit.

In the course of the argument, the case of Mason v. The Blaireau [2 Cranch (6 U.

S.) 240] was often cited; and that case was very justly considered as the best standard for governing our decision in this. I readily receive it as such; and think, that when compared with that, the merits of this case are strikingly inferior. 1st. The amount saved was only about two-thirds the present amount. 2nd. The attempt to save the Blaireau was universally acknowledged to to be attended with great danger, almost desperate, such was her leaky and shattered state; here the danger is universally allowed to have been but inconsiderable, as the loss of the masts in fact, in some measure diminished it. The distance navigated there, is stated to have been three thousand miles; true or false, is immaterial, if the court were under the influence of that impression. If the owner's interest had been considered, it need not have been navigated above twelve hundred. Whether the Blaireau was derelict or not, I have before declared, technically immaterial, but I should think it unavailing to contend that Tooles' being on board, could diminish the merit of the salvors. To the merit of saving the property was added the more important consideration of saving human life. Finally, it has been contended, that the owners of the ship in this case ought to be allowed their freight and general average, principally on the ground of their having precipitated a sale of vessel and cargo, so as to deprive the owners of an opportunity of tendering salvage, and proceeding on their voyage. If precipitating sale is any ground of complaint, it is obvious that it can only be made against the district court, and not against the salvor. I am fully aware, that great and unnecessary loss to owners may be produced in such cases, as salvage can be as well ascertained by appraisement as by sale. But if a court has unadvisedly been led to order a sale in such a case, it is as against the salvors, damnum absque injuria. Freight and average can with no propriety be charged upon salvors, as both the freight and the average are equally the result of the efforts in saving the ship and goods. That claim, therefore, must be wholly rejected.

Upon the whole, I shall decree to the salvors the one fourth of the net proceeds of the vessel and cargo, and hesitate while I do so, under an apprehension that I have given too much. This will amount to more than twenty-one thousand dollars; of this sum let four hundred be paid to the pilot boat Opposition, and in the distribution of the balance, I adjudge one third to the Margaret, her freight cargo and crew. The remaining two thirds to be divided into twenty-four parts, and distributed as follows: to Fisher, eight parts; to Beach, one part; to the five free seaman, and the owner of Perry the slave each one part. In distributing the one third assigned to the Margaret, let the sum be also divided into twenty-four parts, sixteen of which are to be divided amongst the owners of the vessel, cargo, and freight, according to their relative value; in which distribution, let the vessel be valued at three thousand dollars, the freight at four thousand, and the cargo at the rate which Fisher himself fixes the value in his testimony, valuing those articles to which he does not testify at the advance proved by him on others. The reason for adopting this mode of fixing the value of the cargo is this: the result is unfavorable to Fisher, but he cannot murmur at it, as it is founded on his own testimony, and Johnson, the owner, being on board, and having consented to the undertaking, is certainly entitled to salvage. In distributing the remaining eight shares of the Margaret's third, it is right that Darrell, the second mate of the Sybil, should participate. He was entered mate to the Margaret, and, what I attach more importance to, he appears to have been desirous of remaining by his own ship. Kennedy is also entitled to some distinction in this division. Let Wilson then have three parts, Darrell one part and a half, Kennedy one part, and the balance be equally distributed among the remainder of the Margaret's crew. The balance of the proceeds must be distributed among the claimants according as they shall prove interest. The claims of freight and average, even as between vessel and cargo, I wholly reject, as the abandonment put an end to the contract, and I consider the salvage paid by the freighters as a substitute for both freight and average. The decree of the district court (that decree awarded fifty per cent. salvage [case unreported]) is thus revised, and anulled so far as it is inconsistent with this decree, and the register will report to this court such evidence relative to interest, as will enable it to make a final order of distribution after paying all costs, which are to be charged upon the entire amount of the sales.

As to the specie, which it appears was taken from the Sybil and saved in the Margaret, I think it not necessary to make any observations respecting it, as it does not appear to me to be at all subject to our jurisdiction. Had any thing improper been done respecting it, we should have enforced such terms upon the salvors as would have been consistent with equity and good conscience; but nothing with this view appears to require the interference of this court.